1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CHRISTOPHER LEONG,                          No.  2:16-cv-1213 MCE GGH P

12                  Petitioner,

13        v.                                      FINDINGS & RECOMMENDATIONS

14   D. ASUNCION,

15                  Respondents.

16

17        *Introduction and Summary*

18            Petitioner, a state prisoner proceeding pro se, has filed a petition for writ of habeas corpus

19   pursuant to 28 U.S.C. § 2254.  The matter was referred to the United States Magistrate Judge

20   pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 302.

21            Petitioner challenges a judgement and conviction entered against him on May 20, 2011 in

22   the Sacramento County Superior Court for a prison sentence of 30 years to life.  Petitioner was

23   convicted of second degree attempted murder and received gang and gun enhancements.

24   Petitioner appealed the conviction which was denied by the California Court of Appeal on

25   October 14, 2014.  ECF No. 22, Exh. A.  Subsequently, on November 19, 2014, petitioner filed a

26   petition for review in the California Supreme Court, which was denied on January 14, 2015.

27   Res't's Lod. Doc. Nos. 7, 8. On April 13, 2015, petitioner filed a petition for writ of certiorari

28

                                              1

with the United State Supreme Court, and was denied on June 8, 2015.  Res't's Lod. Doc. Nos. 9, 10.

A federal petition for habeas corpus was filed on June 3, 2016- adding an unexhausted claim.  ECF No. 1.  In response to the Motion to Dismiss filed by respondent, ECF No. 12, petitioner filed an opposition and a motion to delete the unexhausted claim (a sentencing claim).  See ECF Nos. 17, 18.  The undersigned granted petitioner's motion to delete the unexhausted claim and proceed with the three remaining claims.  ECF No. 19.  The following claims, which all parties agree are exhausted, are:

1. The trial court prejudicially erred in admitting evidence by expert witness;

2. Ineffective assistance of counsel; and

3. The gang expert's testimony was improper. [1]

After independent review of the record, and application of the applicable law, petitioner's application for habeas relief should be denied.

***Factual Background***

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following statement:

> This case arises from a homicide on October 31, 2009, and two drive-by shootings five weeks later.  Defendants Christopher Leong and Juan Carlos Carranco, Jr., were charged in a consolidated information with the attempted murder of Jessie Mena (Pen. Code, §§ 664/187, subd. (a); count two,[2] shooting at an occupied vehicle (§ 246; count three), and shooting at an inhabited house (§ 246; count four); Carranco and Manuel Miguel Sotelo were charged with the first degree murder of Carlos Cervantes (§ 187, subd. (a); count one); and Carranco alone was charged with felony evading a peace officer with willful disregard for public safety (Veh. Code, § 2600.2. subd. (a); count five).  The information also alleged various gun (§ 12022.53, subds. (b), (c), (d) & (e)(1)) and gang (§ 186.22, subd. (b)(1), (4)) enhancements.  Carranco's motion to sever count one from the trial of the remaining counts was granted, and the trial of count

---

[1] Petitioner does not raise the primary issue raised on appeal, that is, petitioner's Confrontation Clause rights were violated by the expert's reliance on testimonial hearsay.  The undersigned will not review that issue here.

[2] [Fn. 1 in original excerpted text]  Further undesignated statutory references are to the Penal Code.

one was ordered to trail the trial of counts two through five.[3]

A jury found defendants guilty of attempted murder, shooting at an occupied vehicle, and shooting at an inhabited house, and Carranco guilty of evading a peace officer with willful disregard for public safety. The jury also found true allegations Leong intentionally and personally discharged a firearm in the commission of the attempted murder of Mena, and that defendants were principals in the attempted murder, shooting at an occupied vehicle, and shooting at an inhabited dwelling offenses were committed for the benefit of, or in association with, the Norteño criminal street gang, and with the specific intent to promote, further, or assist the Norteños or any member of that criminal street gang.

A second jury found Carranco not guilty of the first degree murder of Cervantes but guilty of the lesser included offense of second degree murder. The jury also found true allegations Carranco intentionally and personally discharged a handgun, and thereby proximately caused the death of Cervantes, and the murder was committed for the benefit of, or in association with, the Norteño criminal street gang, and with the specific intent to promote, further or assist the Norteños or any member of that criminal street gang.

The trial court sentenced Leong to an aggregate term of 30 years to life in state prison, consisting of 15 years to life for shooting at an occupied vehicle and a consecutive 15 years to life for the shooting at an inhabited house. The trial court stayed Leong's sentence for attempted murder pursuant to section 654.

The trial court sentenced Carranco to an aggregate term of 70 years to life, plus 13 years in state prison, consisting of 15 years to life for second degree murder, plus 25 years to life for the gun enhancement, plus 10 years for the gang enhancement; a consecutive 15 years to life for shooting at an occupied vehicle; a consecutive 15 years to life for shooting at an occupied dwelling; and a consecutive three years for evading. The trial court stayed Carranco's sentence for attempted murder pursuant to section 654.

Defendants filed separate appeals, which we consolidated on our own motion for purposes of oral argument and decision only.

Defendants raise claims of evidentiary error and prosecutorial misconduct. We shall conclude that defendants forfeited most of their claims by failing to raise them below, and in any event, all but one fails on the merits. As to the sole meritorious claim, we shall conclude the error was harmless under any standard. Accordingly, we shall affirm the judgments in their entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

A. Jury Trial Number 1 (Counts Two through Five)

---

[3] [Fn. 2 in original excerpted text] Manuel Sotelo later pleaded no contest to one count of assault with a deadly weapon and admitted the gang enhancement in exchange for an agreed upon sentence of eight years in state prison.

On the evening of December 9, 2009, Jessie Mena was visiting a friend at the Dewey Garden Apartments on Dewey Boulevard and Falconer Way in the south area of Sacramento. He left around midnight and, as he was walking to his car on Falconer Way, he saw a white Ford Taurus slowly drive past him. The car was full of males, and the male seated in the front passenger seat was hanging out of the window looking around. Mena did not have a "good feeling," so he hurried to his car, got inside, and attempted to leave. As he was headed down Falconer Way toward Dewey Boulevard, the Taurus circled back around, and the male seated in the front passenger seat began shooting. Mena sped up, turned into a parking lot "to try to avoid getting shot," jumped out of his car, and ran about 15 yards to his friend's apartment. As he turned into the parking lot, a shot hit the passenger door of Mena's car, and his back window shattered. Once back inside his friend's apartment, he told his friend's father Larry Trejo that someone was shooting at him.

The male who fired the shots was "light-skinned." Mena knew the male as not lack but otherwise could not identify his race. Mena believed the man who fired the shots was wearing a white or light-colored shirt.

Trejo heard approximately five gunshots after Mena left the apartment. Trejo telephoned law enforcement approximately five minutes after Mena returned to the apartment and was placed on hold for approximately two minutes. Officers were dispatched to the scene at 12:40 a.m.

According to Trejo, it was not uncommon to hear gunshots around the apartment complex. The apartment manager's grandson, Eddie Lerna, resembled Mena and drove a similar car. Treho did not know if Lerna was in a gang but testified that he wore a lot of red clothing and got "into problems a lot."

Mena denied belonging to a gang, ever being associated with a gang, or having any enemies. He had never seen the white Taurus prior to the shooting.

Ten spent shell castings were found near the intersection of Falconer and Dewey. The casings "traveled from the intersection…approximately…30 feet." A projectile consistent with a bullet was found in a bucket outside the apartment complex's laundry room.

Meanwhile, at 12:29 a.m. that same morning, Sacramento Police Officer Mario Valenzuela was parked alongside Officer Ralph Knecht in the area of 21st Avenue and Bradford when he heard about four gun shots north or northwest of their location. Valenzuela and Knecht began looking for vehicles leaving the area. Knecht positioned himself along 21st Avenue because it is a main thoroughfare, and one or two minutes later, a call came over the radio stating that there had been a "possible drive-by shooting in the area of 17th Avenue," the same general area where Valenzuela said he heard the gunshots. No more than a minute later, Knecht saw a "white sedan" "shoot across" 21st Avenue on 71st street. The car was traveling at a "decent rate of speed" and was coming from the area where the shots had been fired. Knecht "went to try to catch up to it," and when he did so, he noticed the car did not have a license plate. Knecht notified dispatch that he was making a traffic stop of a white Ford Taurus with approximately six occupants and then activated his overhead

lights.  When the Taurus failed to stop, Knecht activated his siren and a pursuit ensued.  During the approximately 12-minute pursuit, the Taurus ran 13 stop signs and numerous stop lights and reached speeds of upwards of 80 miles per hour.  Knecht did not observe anyone throw anything out of the Taurus during the pursuit; however, he lost visual contact with the Taurus several times such that he would not have been able to see if something was thrown from the car.

The pursuit ended after the Taurus experienced mechanical problems.  All six occupants were ordered out of the Taurus at gunpoint.  Carranco was seated in the driver's seat, and Leong was seated in the front passenger seat.  The other occupants were Phoenix Allianic, Justin Guerrero Ceasar Santana, and David Hinnen.  Leong, who is Asian, was wearing a white, black, and green striped shirt.

Defendants were placed together in the backseat of Knecht's patrol car and were recorded by the car's "in-car camera."  On the recording, a male voice can be heard stating, "I ditched it."

The Taurus involved in the pursuit matched the description of the vehicle given by Mena earlier that morning.  Approximately 1:00 a.m., Mena was brought to the location where the pursuit as the same car that was involved in the shooting on Falconer Way.  Mena was "100 percent sure it was the same vehicle."

The Taurus was searched, and no firearm was found.  There was one spent shell casing and one live bullet underneath the front passenger seat, one shell casing between the driver's side window and the front windshield, a spent round that someone shot into the car on the floorboard.

Officers also searched the pursuit route, particularly those areas where Knecht lost sight of the Taurus, and no gun was found.

At 1:10 a.m., a forensic investigator arrived at 7512 17th Avenue.  She observed five 40-caliber shell casings in the street in front of the house, a spent bullet on the driveway, two bullet holes through the front window of the residence, one bullet hole in the garage door, and one bullet hole in a car parked in the driveway.  The residents were a couple in their forties or fifties.

At approximately 2:40 a.m., defendants' and the other occupants' hands were tested for gunshot residue.  According to the prosecution's expert in gunshot residue analysis, gunshot residue consists of articles containing lead, barium, and antimony.  These chemicals exist separately inside the primer cup inside the shell.  When the gun is fired, however, the mixture vaporizes and the chemicals fuse together.  The combination of lead, barium, and antimony does not exist in nature and is not used in any common industry – the "only occurrence that has been found for these particles are from the discharge of a firearm."  "Because these chemicals existed separately, when they are vaporized there's no guarantee [all three] will condense together.  So what that means is we have an opportunity to produce particles that contain lead, barium, and antimony, but we also have opportunities to get two-component particles, lead and barium, lead and antimony, or antimony and barium."  Gunshot residue has no adhesive properties, and thus, can be removed quite easily.  Eighty percent of

gunshot residue falls off a moving object or person within two hours. The expert further explained that "if a person has gunshot residue particles detected on them, that means they either fired a weapon, handled a weapon that has been fired, or ammunition that had been fired, or they've been near a weapon when it was discharged." In cases where only one or two particles of gunshot residue are detected, secondary transfer cannot be ruled out.

There was one lead, barium, and antimony, six lead and antimony, and eight lead-only particles detected in the samples collected from Hinnen. There was one lead, barium, and antimony, one lead and antimony, and six lead-only particles detected on the samples collected from Allianic. There was one lead, barium, and antimony, and two lead and antimony particles detected on the samples collected from Guerrero. There were two lead, barium, and antimony, and two lead-only particles detected on the samples collected from Santana. There were four lead, barium, and antimony, nine lead and antimony, and 12 lead-only particles detected on the samples taken from Leong. There were 14 lead, barium, and antimony, 14 lead and antimony, one lead and barium, and five lead-only particles detected on the samples taken from Carranco. According to the expert, the amount of gunshot residue detected on the samples taken from Leong makes secondary transfer unlikely. The amount of gunshot residue detected in the samples collected from Carranco is inconsistent with secondary transfer; rather, it is consistent with firing a weapon, handling a fired weapon, or being near a weapon when it was fired.

According to the prosecution's firearm and tool mark identification expert, the shell casings collected from Falconer Way, 17th Avenue, and inside the Taurus were fired from the same semi-automatic firearm.

The prosecution's gang expert, Detective Donald Schumacher, was permitted to testify as an expert in Hispanic street gangs, specifically the Norteños. Schumacher had been a detective in the Sacramento Police Department's gang unit for over four years and specialized in Hispanic street gangs in the "south part of Sacramento," specifically the Norteños. He had served as the lead investigator on no less than 50 gang crimes and assisted in the investigation of at least one hundred others. He typically had contact with six to eight gang members per week. The contact typically involved "interviewing them for a case or…doing…proactive intel-type work," such as "the [ins] and outs of the gang itself, how it works, [and] who's in it…." He also reviewed records and spoke with patrol officers and members of neighboring law enforcement agencies to gather information about Hispanic gangs, and in particular, the Norteños.

Schumacher opined that the Norteños are a criminal street gang, explaining that there are about 1,500 Norteño gang members within the County of Sacramento, they have a common symbol, the number 14 and the color red, and they claim all Sacramento as their turf. There are a number of neighborhood subsets within the larger Norteño street gang in Sacramento, including the Varrio Diamonds and 14th Avenue, and there are rivalries among some of the subsets. Norteños have a common enemy, the Sureño criminal street gang. Gang members often show allegiance to their gang with tattoos. Any version of the number four or 14, which goes to "N" being the 14th letter of the alphabet, is a common tattoo for Norteño gang members. Norteños also use various hand signs associated with the

number 14, such as holding up one finger on one hand and four on the other.

When asked for his expert opinion as to the primary activities of the Norteños, Schumacher responded that he had "been part of investigations stemming from just graffiti to car thefts, burglaries, carjackings, sales of narcotics, drive-by shootings, possession of illegal firearms, all the way up to homicide."

Schumacher further opined that the Norteños were engaged in a pattern of criminal gang activity, explaining that he investigates two or three "Norteño crimes" on average per week, "whether they be assaults, shootings, or just follow up on maybe a gun possession cases…." The prosecutor asked Schumacher about "a couple of specific examples." First, the prosecutor asked Schumacher indicated that he had "reviewed that case and talked to the investigating detective on that." He explained that Martinez, a Norteño, showed up uninvited to a birthday party at a local restaurant and got into a dispute with one of the partygoers. Martinez asked the partygoer where he was from, and the partygoer responded, "I'm not from anywhere. I don't gang bang." As the partygoers attempted to leave, Martinez pulled out a handgun and fired multiple shots into the partygoer's car.

The prosecutor also asked Schumacher if he was "familiar with the crime of attempted murder committed by Mr. [Gabriel] Torres on July 15th, 2007." Schumacher indicated that he was familiar with "that case" because he "reviewed the report, and…spoke to the investigat[ing] detective…." According to Schumacher, Torres, a Norteño, and three others approached a group of people at a gas station and began calling them "scraps," a derogatory term for a Sureño gang member. When Torres and members of his group began calling out "Oak Park," one of the victims said, "[W]e're not from anywhere. We don't want any problems." Immediately thereafter, Torres picked up a metal trash can and threw it through the driver's window of the victim's car, striking the victim in the face. When asked if Torres had "a subsequent issue" in September 2007 Schumacher said Torres was present at a fist fight that occurred outside Torres' cousin's house. Torres' cousin saw a former Norteño gang member and began calling him a snitch. A fist fight ensued, Torres' cousin knocked the former gang member to the ground, and Torres shot him multiple times.[4]

---

4  [Fn. 3 in original excerpted text]  The prosecution also introduced court records showing: a jury found Martinez guilty of attempted murder and maliciously discharging a firearm at a motor vehicle on August 5, 2007, and found true allegations Martinez personally discharged a firearm in the commission of the attempted murder, and maliciously discharged the firearm at a motor vehicle for the benefit of, or in association with the Norteño criminal street gang, with the specific intent to further, promote, and assist criminal conduct by gang members; Torres had been charged with assault and felony vandalism arising out of the July 15, 2007, incident and had pleaded no contest to felony vandalism in exchange for dismissal of the assault charge; and Torres had been charged with two counts of attempted murder, along with firearm and gang enhancements, in connection with the September 10, 2007, incident and had pleaded no contest to two counts of assault with a deadly weapon and admitted the firearm and gang enhancements in exchange for a stipulated sentence.

7

The detective had no personal knowledge concerning the facts of these cases; rather, he had reviewed three reports regarding the cases.

Schumacher was familiar with the Dewey Garden Apartments. He had been to the apartment complex and had been involved in investigations of suspects who lived there. From what he understood from a couple of independent sources, in late 2009, the apartment complex was primarily inhabited by Varrio Diamonds. Schumacher also was familiar with the manager of the apartment complex and her grandson, Eddie Lerna. Schumacher had contacted Lerna with a few other Varrio Diamonds at the apartment complex in 2007. Schumacher photographed Lerna, spoke to him, and validated him as a Varrio Diamonds gang member.

Referring to "the police department reports," the prosecutor asked Schumacher if he was familiar "with the address of the shooting on December 10th, 7512 17th Avenue," and Schumacher responded, "That's the address of a Varrio Diamonds gang member named Adam White." The prosecutor then asked Schumacher to tell him about the relationship between the Norteño subsets Varrio Diamonds and 14th Avenue. Schumacher responded, "It's not a good relationship," explaining that in 2005, Tony Sotelo, a 14th Avenue gang member, shot and killed a Varrio Diamonds gang member in a bar fight. The victim was good friends with Adam White, and White's half-brother Kenny Anderson. Anderson was present during the shooting and identified Tony Sotelo as the shooter during an interview with police. The feud between the Varrio Diamonds and 14th Avenue continued past December 2009. Schumacher explained that in December 2010, a year after the drive-by shootings at issue, "we were . . . doing surveillance on the house next door to 7512 . . . when we actually saw a silver car pull up, subject get out and fire shots into the house in broad daylight." Following a short pursuit, Schumacher arrested two men, one of whom was Santana, a 14th Avenue gang member and one of the occupants of the white Taurus on December 9, 2009. Schumacher further testified that Tony Sotelo is the brother of Manuel Sotelo, and that Manuel Sotelo and Carranco were involved in the shooting death of an out-of-town Norteño on October 31, 2009, about five weeks before the shootings at issue in this case.

Schumacher opined that each of the occupants of the white Taurus was a Norteño gang member in December 2009. More particularly, he opined that Allianic was a member of the 14th Avenue subset because he admitted to being a Norteño to another officer, was photographed making a hand gesture of the letter "A," which is associated with the 14th Avenue subset, and repeatedly had been contacted with other Norteño gang members. He opined that Guerrero was a member of the Fruitridge subset because he had been contacted at least four times with other validated Norteño gang members, mostly from Fruitridge, and had been involved in several gang related crimes, including auto theft, possession of illegal firearms, and sales of controlled substances. Schumacher opined that Hinnen was a member of the Fruitridge subset because he had been contacted wearing gang clothing on multiple occasions, repeatedly associated with other gang members, mostly "Fruitridge Norteños," and had the letters "FR," which stand for Fruitridge, tattooed in red on his arm. He opined that Santana was a member of the 14th Avenue subset because he had been contacted by officers in gang related clothing, had been contacted at least 11 times with other Norteño gang members, mostly 14th Avenue, had "AVE" tattooed

8

on his hands, and had been photographed displaying the hand gesture "A," a common sign for 14th Avenue. He opined Leong was a member of the Fruitridge subset because he had been contacted at least three times with other Norteño gang members, most of whom were members of Fruitridge, and had been involved in crimes associated with gang members, including burglary, possession of concealed weapons, and sales of narcotics. Finally, Schumacher opined that Carranco was a member of the 14th Avenue subset because of his involvement with Manuel Sotelo, a member of 14th Avenue, in the shooting of an out-of-town Norteño in October 2009, and because he had been contacted at least twice with other gang members, had "14th Ave" tattooed on the inside of his index finger, had a large red "A" tattooed on his forearm, had a crossed out "S" or dollar sign tattooed on his body, which signifies disrespect for the Sureños, and had been photographed with other gang members wearing red and "throwing up" the hand sign "A," which is associated with 14th Avenue.

The prosecutor asked Schumacher the following hypothetical: "[A]ssume that there are six Norteño gang members of either 14th Avenue or Fruitridge in a car. [¶] They . . . drive to an area that is in a rival Norteño set's area, Diamonds' area. They see a man who resembles, both physically and by the car he's heading towards, a rival Diamonds' gang member, and they shoot approximately ten times at that person. [¶] Would you have an opinion as to whether that crime was committed for the benefit of, or in association with, the Norteño criminal street gang?" Schumacher responded, "[I]t most definitely was," explaining the car was full of Fruitridge and 14th Avenue gang members who, by shooting, "were trying to eliminate [a person] who they perceive to be a rival gang member."

Before posing a second hypothetical, the prosecutor asked Schumacher whether he was "aware of any facts that would lead you to the conclusion that Manuel Sotelo has taken . . . the disagreement between Tony Sotelo, his brother, and the Kenny Anderson-Adam White faction personally?" Schumacher responded, "That would be a conclusion that I would very strongly consider . . . ." Among other things, Schumacher noted that Manuel Sotelo had the phrase, "Fuck Huero" on his left index finger," and "Huero" referred to Anderson. Schumacher further testified that according to the residents at 7512 17th Avenue, White and Anderson had been living at that address until about two months prior to the shooting.

The prosecutor then posed the following hypothetical: "[S]ix Norteños from either the 14th Avenue or Fruitridge subsets do a drive-by shooting on the 17th Avenue house that is intimately associated with Adam White and Kenny Anderson, Diamonds Norteños. [¶] The driver of the vehicle that does the drive-by is closely associated with        Tony Sotelo's younger brother who has taken that disagreement personally to the point of getting a tattoo. [¶] Would you have an opinion as to whether that drive-by shooting was done for the benefit of, or in association with the Norteño criminal street gang?" Schumacher responded that "obviously it's [in] association with the gang and other gang members," noting that there were six gang members in the car.

During cross-examination, Schumacher acknowledged that he did not have any role in investigating the crimes in this case and agreed that "[his] opinions and the information [he's] providing today here, is based on reading reports." He concluded Leong was a Norteño based upon a review

of various police reports; he personally had no dealings with Leong. Schumacher acknowledged that selling marijuana is not a "gang crime" because marijuana is not a controlled substance, and that Leong had been convicted of selling marijuana. He also agreed that persons other than gang members commit the other crimes Schumacher identified in relation to Leong -- burglary and gun possession.

B. Jury Trial Number 2 (Count One)

On the night of October 30, 2009, Carlos Cervantes, Sonja Jones, Noe Alvarado, Israel Cuevas, and several others travelled from Marysville to south Sacramento to attend a party. There were between 30 and 100 people at the party, a number of whom appeared to be Norteño gang members based on their clothing and tattoos. Sometime after midnight, the party began to spill into the street and people started shouting the names of gangs. Most of these individuals, including Carranco, were shouting "14th Avenue." Others were shouting, "Diamonds," "Gardens," and "Crips." Cuevas had served a previous prison term and was not supposed to be in the presence of gang members, so Cervantes, Jones, Alvarado, and Cuevas decided to leave. Around this time, the individuals who had been chanting gang names began yelling and pushing Cuevas. A man with a large neck tattoo, later identified as Manuel Sotelo, told Cuevas that he "needed to learn respect." Meanwhile, three or four other men began punching and kicking Alvarado. When Jones threatened to break a bottle on the attackers' heads if they did not move away from Alvarado, the fighting ceased. Cervantes was not involved in the altercations; he was urging everyone not to fight.

After the fight, Cervantes, Jones, Alvarado, and Cuevas walked down the street and away from the party. When they reached the corner, Alvarado realized that his cell phone was missing, and the group returned to the party to look for it. When Alvarado asked the people at the party to identify the person who had attacked him, a number of people took responsibility and called Alvarado a "bitch" and a "punk." Alvarado said he did not want any problems and attempted to shake one man's hand. The man pushed Alvarado's hand away and started to walk off, which sparked an altercation between Cuevas and Manuel Sotelo. Alvarado and Cervantes joined in the scuffle, and a large brawl broke out. During the brawl, Cervantes stood in front of Alvarado and held his hands up in an effort to break up the fight. As the fight moved into the street, Carranco was hitting Cervantes while Cervantes was pushing him away. Jones then saw Carranco point a gun at Cervantes's head and shoot. Another partygoer testified that she observed Carranco swing his right fist at Cervantes in an overhead motion and an instant later heard a gunshot and saw Cervantes on the ground. Cervantes later died as a result of the gunshot wound to his head.

Schumacher again testified for the prosecution as an expert in Hispanic street gangs, specifically Norteños. His testimony concerning the Norteños and their status as a criminal street gang that engaged in a pattern of criminal gang activity was identical in all material respects to that given at the first trial. In addition, Schumacher testified that he reviewed the facts of the case and researched Carranco's history. He had no information that Carranco had been involved in any criminal activity other than the shooting at issue and the two drive-by shootings in December 2009. He opined that Carranco was a member of 14th Avenue, a Norteño subset, at the time of

10

the shooting. He based his opinion on the following: Carranco was repeatedly in the company of other Norteños; he had an "A" tattooed on his forearm; he had been photographed displaying 14th Avenue hand gestures with other gang members, including Manuel Sotelo; and he had participated in gang related crimes. In particular, Carranco was arrested on December 10, 2009, following two drive-by shootings and was later "convicted of both those events" and gang enhancements were found true. That case involved 14th Avenue members    shooting at other Norteños.

Schumacher was given a hypothetical based on facts rooted in the evidence and opined that such a shooting was for the benefit of or in association with the Norteño criminal street gang. Schumacher explained that it was done in association with 14th Avenue because there were multiple members of that gang present. He explained that it was also for the benefit of the Norteños, even though the victim may have been a Norteño, because the victim was from out-of-town and was on 14th Avenue turf. According to Schumacher, Norteños fighting Norteños helps the gang as a whole "because the community sees this, other members of the gang see this, . . . people on the street see this, and they realize that if these two Norteño gang members are fighting each other, what would they do to a citizen who actually came forward and said this is what I saw, . . . or I want to testify."

Carranco testified on his own behalf at trial. He admitted that he was a member of the Norteño criminal street gang and that he had been a member on the night of the shooting. He arrived at the party around 10:45 p.m. He recognized a number of people at the party, but the only person he knew personally was Manuel Sotelo. When people began shouting their "hoods," Carranco yelled out, "14th Ave" a couple of times. He remembered seeing Alvarado doing calisthenics in the street but denied ever seeing Cervantes prior to the shooting. He also denied being present at the party when the first    altercation occurred, stating that he had gone to the liquor store to purchase some chewing gum. When he returned, he saw people fighting and was "blind-sided" by a punch to the left side of his face. Although he did not see who had punched him, he began punching Cervantes, who was standing nearby. Carranco exchanged blows with Cervantes, and at some point Carranco backed away, pulled out a semi-automatic handgun, and told Cervantes to "get back." When Cervantes moved closer and began punching Carranco in the face and head, Carranco began hitting him with the gun. As Carranco was swinging the gun at Cervantes, it went off. Carranco was shocked; he was not expecting the gun to go off and did not intend to shoot or kill Cervantes. He was trying to get Cervantes away from him.

Less than an hour after the shooting, Carranco sent the following text message: "I know, did his brains get all over the place? Haha, don't tell no one, at all for real, blood, on 14th Avenue, and tell them niggas, too . . . ." In a second text message, he wrote, "I did, but I can't sleep, I'm on . . . ." In a third text message, he stated, "I know, but fuck it, it's the Ave. over anything." Two days later, he sent another text message: "Was there blood all over your shoes from the other night? Ave. Gang."

Carranco admitted his involvement in two drive-by shootings five weeks after shooting Cervantes.

11

People v. Christopher Leong, No. C068260, 2014 Cal. App. Unpub. LEXIS 7286, 2014 WL 5152574, at *1-17 (Cal. Ct. App. Oct. 14, 2014).

### *AEDPA Standards*

The statutory limitations of a federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The text of § 2254 provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not requires a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 562 U.S. 86, 98 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 99, citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Harrington, supra, at 101, citing Williams v. Taylor, 529 U.S. 362, 410 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 101, citing Yarborough v.

1    Alvarado, 541 U.S. 652, 664 (2004).

2         Accordingly, "a habeas court must determine what arguments or theories supported

3    or…could have supported[] the state court's decision; and then it must ask whether it is possible

4    fairminded jurists could disagree that those arguments or theories are inconsistent with the

5    holding in a prior decision of this Court." Id. at 102. "Evaluating whether a rule application was

6    unreasonable requires considering the rule's specificity. The more general the rule, the more

7    leeway courts have in reaching outcomes in case-by-case determinations." Id. Emphasizing the

8    stringency of this standard, which "stops short of imposing a complete bar of federal court

9    relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

10   cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

11   was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

12        The undersigned also finds that the same deference is paid to the factual determinations of

13   state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

14   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

15   decision that was based on an unreasonable determination of the facts in light of the evidence

16   presented in the state court proceeding." It makes no sense to interpret "unreasonable" in

17   §2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

18   factual error must be so apparent that "fairminded jurists" examining the same record could not

19   abide by the state court's factual determination. A petitioner must show clearly and convincingly

20   that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338 (2006).

21        The habeas corpus petitioner bears the burden of demonstrating the objectively

22   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

23   Woodford v. Viscotti, 537 U.S. 19 (2002). Specifically, the petitioner "must show that the state

24   court's ruling on the claim being presented in federal court was so lacking in justification that

25   there was an error well understood and comprehended in existing law beyond any possibility for

26   fairminded disagreement." Harrington, supra, at 102. "Clearly established" law is law that has

27   been "squarely addressed" by the United States Supreme Court. Wright v. Van Patten, 552 U.S.

28   120, 125 (2008). Thus, extrapolations of settled law to unique situations will not qualify as

                                                    13

clearly established.  See, e.g., Carey v.Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection). The established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Id. at 8.  Where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record regarding that issue.  Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Finally, if the state courts have not adjudicated the merits of the federal issue, no AEDPA deference is given; instead the issue is reviewed de novo under general principles of federal law. Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).  However, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, __U.S.__ , 133 S.Ct. 1088, 1091 (2013).

### *Discussion*

### Claim One: Prejudicial Error in Admitting Evidence

Petitioner argues the trial court prejudicially erred in admitting evidence of co-defendant's, Carranco, involvement in an October 2009 gang-related shooting that resulted in the death of an out-of-town Norteño.  ECF No. 1 at 5.

At trial, the prosecution's gang expert, Schumacher, referred to Carranaco's involvement in the October 2009 shooting as a basis for his opinion that the two drive-by shootings were gang motivated.  Carranco's trial counsel objected to the introduction of such evidence under Cal.

14

Evid. Code § 352.  Carranco's trial counsel argued the evidence, although relevant, was more prejudicial than probative.  Prosecution contended that the evidence was relevant to show Carranco's intent and motive in committing the drive-by shootings.  The trial court concluded the evidence was admissible as "a part of the basis of the expert's opinion as it relates to motivation and intent factors."  People v. Christopher Leong at*25-26.  However, prosecution was admonished by the trial court to "tread very lightly" and "not to focus on it."  Id.  at *26.  The following day, the trial court questioned whether evidence that the October 2009 shooting resulted in a death should be excluded.  The prosecutor argued the evidence was relevant in establishing Carranco's intent to kill.  Carranco's trial counsel argued that the evidence that an individual had died as a result of a prior shooting would be overly prejudicial and not relevant.  The trial court ultimately concluded the evidence was admissible as its "strong probative value was not substantially outweighed by the potential for prejudice."  Id.  The following testimony took place during the prosecutor's direct examination of Schumacher:

> Q.  And are you familiar with the fact that Manuel Sotelo and Juan Carranco were involved in the shooting death of an out of town Norteño on October 31st, 2009?
>
> A.  Yes.
>
> Q.  About five weeks before this?
>
> A.  Yes.

Id.

Petitioner claims the admission of Schumacher's testimony was improperly admitted because the "little probative value it may have had was substantially outweighed by its prejudicial effect."  ECF No. 1 at 21. Petitioner cites to various evidence codes relating to relevancy (Cal. Code §§ 350, 351, 210) and Penal Code § 186.22(b)(1) for the proposition that the evidence was inadmissible and therefore there was insufficient evidence to support the charge of a gang enhancement.  ECF No. 1 at 21-22.  Petitioner argues the facts of the instant case fail to show Carranco acted with the same motive and intent as he did in the October 2009 shooting death of a Norteño. Accordingly, petitioner contends this wrongful admission violated the Due Process Clause of the Fourteenth Amendment.

1    More will be said about this contention in the section on ineffective assistance of counsel,

2    but suffice it to say that petitioner somewhat misses the point.  He has no standing to assert that

3    Carranco's rights were violated; rather it has to be that the admission of evidence against

4    Carranco, even if properly admitted against Carranco, was of such gravity that it bled over to

5    unfairly taint petitioner.  The undersigned presumes that if the evidence did not come in at all, it

6    could not have tainted petitioner.

7    However, petitioner's challenge, no matter how posed, entirely rests on the applicability

8    of state evidentiary rules.  A challenge to a state court's application of state law does not give rise

9    to a cognizable federal habeas claim.  See Estelle v. McGuire, 502 U.S. 62, 67 (1991)

10   (recognizing that issues of state law do not warrant federal habeas relief).  If the issue before a

11   federal district court is "whether the state proceedings satisfied due process; the presence or

12   absence of a state law violation is largely beside the point."  Holley v. Yarborough, 568 F.3d

13   1091, 1101 (9th Cir. 2009) (citing Jammal v. Van de Kamp, 926 F.2d 918, 919-10 (9th Cir. 1991)

14   (internal quotations omitted).  Therefore "the admission of evidence does not provide a basis for

15   habeas relief unless it rendered the trial fundamentally unfair in violation of due process."

16   Holley, 568 F.3d at 1101.  However, the Supreme Court has yet to hold that admission of

17   irrelevant or prejudicial evidence raises constitutional concerns.  As set forth in the AEDPA

18   standards, such a Supreme Court pronouncement is the *sine qua non* for federal habeas corpus

19   cognizability.  To the extent petitioner argues that admission of Schumacher's testimony is

20   unsupported by the evidence and therefore violates the state law's application of the evidence

21   code, thereby infringing his due process rights, such a claim is a non-starter in a habeas action

22   governed by AEDPA except in the most egregious, prejudicial situations.  Estelle v. McGuire,

23   502 U.S. 62, 67-68 (9th Cir. 1991); Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009)

24   (recognizing that the Supreme Court has not found due process violation by the introduction of

25   prejudicial evidence).  See also Greel v. Martel, No. 10-16847, 2012 WL 907215, at *504 (9th

26   Cir. Mar. 19, 2012); White v. Davey, No 2:14-cv-1427-EFB P, 2016 WL 7404761, at *10 (E.D.

27   Cal. Dec. 12, 2016); Marks v. Davis, No. 11-cv-02458-LHK, 2016 WL 5395958, at *14 (N.D.

28   ////

1   Cal. 2016 Sept. 19, 2016); Mermer v. McDowell, No. cv 16-932-VAP (E), 2016 WL 53292623,

2   at *16 (C.D. Cal. Aug. 15, 2016).

3          For the aforementioned reasons, the court finds that the trial court, in permitting gang

4   expert, Schumacher, to testify to the October 2009 shooting death of a Norteño, does not raise a

5   meritorious claim in federal court.  Moreover, petitioner fails to presents any legal arguments that

6   the trial court's admission of the testimony rendered the trial fundamentally unfair.  Accordingly,

7   this claim should be denied.

8                              Claim Two: Ineffective Assistance of Counsel

9          Petitioner claims his defense counsel was deficient for failing to object to the admission of

10  Schumacher's testimony with respect to the evidence regarding Carranco's shooting in another

11  situation, i.e., Count 1 of the information.  Petitioner argues his counsel's failure to join

12  Carranco's trial counsel's challenge to the relevancy of the evidence, and any forfeiture of

13  preserving a challenge, rendered his trial counsel's assistance ineffective.  The 3rd Appellate

14  District Court of Appeal provided the following analysis on the issue:

15          Before we determine whether Leong's rights were violated, we must
            decide whether he preserved his claim for appellate review. Although
16          Carranco moved to bar Schumacher from referring to Carranco's
            involvement in the prior shooting, Leong did not join in the objection or
17          interpose his own. Given the trial court's treatment of Carranco's
            objection, one certainly could argue that any objection by Leong would
18          have been futile. (People v. Wilson (2008) 44 Cal.4th 758, 792-793.)
            Leong inexplicably fails to make any such argument, claiming only that
19          "[i]f this court finds that defense counsel failed to object …, counsel was
            deficient for failing to do so." As we shall explain, even assuming the
20          issue was preserved for review, it fails on the merits. Accordingly,
            Leong's trial counsel was not deficient. (People v. Price (1991) 1 Cal.4th
21          324, 387 [counsel's failure to make a futile or unmeritorious objection is
            not deficient performance].)
22

23  People v. Christopher Leong at*26.

24         First and foremost, although petitioner argues that his trial counsel's failure to challenge

25  the admission of Schumacher's testimony of the October 2009 shooting resulted in a forfeiture of

26  the claim, the Court of Appeal clearly addressed petitioner's ineffective assistance of counsel

27  claim "assuming that the issue was preserved for review."  Therefore, whether trial counsel's

28  failure to challenge the admission of evidence resulted in forfeiture of the claim is moot.

                                                  17

Certainly, Respondent does not raise a procedural bar argument for this claim.[5]  Accordingly, the next issue to be addressed is whether trial counsel's failure to join Carrano's trial counsel's challenge to the relevancy of the evidence raises a meritorious ineffective assistance of counsel claim.  The undersigned finds that it does not.

The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 688, 104 S.Ct. at 2065.  To this end, the petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  Id. at 690, 104 S.Ct. at 2066.  The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  Id.  "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir.1990) (citing Strickland, 466 U.S. at 689, 104 S.Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at 693, 104 S.Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694, 104 S.Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a fundamental fairness standard.  Williams v. Taylor, 529 U.S. 362, 391–93, 120 S.Ct. 1495, 1512–13, 146 L.Ed.2d 389 (2000), (citing Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)).

The Supreme Court has recently emphasized the importance of giving deference to trial counsel's decisions, especially in the AEDPA context:

_____

[5]  Nor could a procedural bar claim prevail as such would constitute the quintessential legal "Catch 22."  The initial thrust of an ineffective counsel claim for failure to object is that counsel unreasonably did not object.  To hold that one could not raise such an ineffectiveness claim because of a failure to object would be circular nonsense.

To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' [Strickland, supra,] 466 U.S. at 688, 104 S.Ct. 2052, 80 L.Ed.2d 674. A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. Id., at 689, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.' Id., at 687, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Id., at 694, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Id., at 693, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Counsel's errors must be 'so serious' as to deprive the defendant of a fair trial, a trial whose result is reliable.' Id., at 687, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

'Surmounting Strickland's high bar is never an easy task.' Padilla v. Kentucky, 559 U.S. 356, ——, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689–690, 104 S.Ct. 2052, 80 L.Ed.2d 674. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' Id., at 689, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; see also Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," id., at 689, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, Knowles, 556 U.S., at ——, 129 S.Ct. at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ——, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable

argument that counsel satisfied <u>Strickland</u>'s deferential standard.

<u>Harrington v. Richter</u>, 562 U.S. 86, 104-105, 131 S.Ct. 770, 787–788, 178 L.Ed.2d 624 (2011);

<u>see also</u> <u>Premo v. Moore</u>, 562 U.S. 115, 131 S.Ct. 733, 178 L.Ed.2d 649 (2011) (discussing

AEDPA review of ineffective assistance of counsel claim where petitioner alleges that counsel

was ineffective at the plea bargain stage).

The California Court of Appeal, as part of claim one above, addressed this claim in its

opinion ruling that trial counsel was not deficient in his failure to object.  Therefore, the

undersigned reviews the ineffectiveness claim with the AEDPA filters firmly in place.  It is well

established that if this court decides that admission of evidence was not error on the "straight"

admissibility claim, there can be no ineffective assistance of counsel for not objecting to the

evidence.  <u>See</u> e.g., <u>Miller v. Keeney</u>, 882 F.2d 1428, 1434 (9th Cir.1989); <u>Meza v. Uribe</u>, 2011

WL 7176145 (C.D.Cal.2011); <u>Dixon v. McDonald</u>, 2011 WL 4433259 (E.D.Cal.2011); <u>People v.

Szadriewcz</u>, 161 Cal.App.4th 823, 836, 74 Cal.Rptr.2d 416 (2008). Every court understands this,

and the decision of the Court of Appeal on the admissibility claim stands as an implicit rejection

on the merits of the mirror image ineffectiveness claim, and is binding here unless its reasoning

on the prejudicial effect of the admission was AEDPA unreasonable.[6]

The Court of Appeal found:

> Here, Carranco's involvement in the shooting death of an out-of-town
> Norteño was properly admitted to explain Schumacher's opinion that the
> drive-by shootings were gang motivated, e.g. "committed for the benefit
> of, at the direction of, or in association with any criminal street gang ...."
> (§ 186.22, subd. (b).) Such evidence tended to show that Norteños did not
> limit their violent acts to members of other gangs; rather, they sometimes
> targeted rival subsets of the same gang. Such evidence was relevant in the
> trial of the two drive-by shootings because the alleged targets of those
> shootings (Lerna, White, & Anderson) all were members of a rival
> Norteño subset. In addition, Carranco's relationship with Manuel Sotelo
> provided a possible motive for the drive-by shooting at 7512 17th Avenue

---

[6] Indeed, the inadmissibility of the evidence would go both to counsel's reasons for not objecting
to the evidence and any asserted prejudice occasioned by not objecting.  If petitioner were
arguing that state law simply did not permit the evidence, the ineffectiveness issue would be over
with the ruling by the appellate court that state law allowed the evidence.  However, since the
basis of the appellate court's ruling was that the evidence was not sufficiently prejudicial, that
component of the ruling may be reviewed through the AEDPA lens.  In other words, when state
law permits a balancing of probative value versus prejudice, this value judgment is susceptible to
AEDPA review.

insofar as Anderson, who identified Manuel Sotelo's brother (Tony Sotelo) as the shooter in a prior homicide, lived there until just prior to the shooting. That Carranco and Manuel Sotelo were involved in a shooting five and one-half weeks prior to the drive-by shootings also tended to show that their relationship was ongoing.

The evidence's probative value was not outweighed, substantially or otherwise, by any potential prejudice to Leong. The testimony concerning the October 2009 shooting was very brief, and the description of the incident was relatively mundane; Schumacher did not say that Carranco was the shooter, much less that he shot the victim in the head. He simply indicated he was "familiar with the fact that Manuel Sotelo and Juan Carranco were involved in the shooting death of an out of town Norteño on October 31st, 2009." Moreover, the trial court reduced the likelihood of any undue prejudice when it instructed the jury consistent with CALCRIM No. 1403 that evidence of gang activity could not be considered to prove that the defendant was of bad character or had a disposition to commit crime. We presume the jury understood and followed this limiting instruction. (<u>People v. Lindberg</u> (2008) 45 Cal.4th 1, 26.)

We reject Leong's contention that evidence concerning the October 2009 incident was irrelevant to the issue of intent because "[a]lthough one can assume that shooting a Sureño would be for the benefit of the Norteños, it makes no sense that killing a fellow Norteño would benefit the Norteños." The jury reasonably could conclude that shooting at someone who is perceived to be a member of a rival Norteño subset (Mena) benefitted the Norteños by instilling fear in the community at large, and that shooting at what was believed to be the home of a fellow Norteño who was perceived to be a "snitch" (Anderson) benefitted the Norteños by discouraging others from engaging in similar conduct.

Finally, we need not consider Leong's additional contention that even assuming Schumacher's testimony concerning Carranco's involvement in the shooting was admissible, his testimony that it resulted in death violated Leong's right to due process of law because any error was harmless under any standard.

<u>People v. Christopher Leong</u> at*27-29.

Certainly, the evidence was more probative if Carranco were the petitioner here rather than Leong. And certainly, if the point on admission had been whether Leong intended to kill the victim in this case, the evidence might well have been more prejudicial than probative. However, the point of the admission was to show the gang relatedness of the shooting in petitioner's case. It is logical to find that if petitioner Leong runs in a group including Carranco, who has gunned down victims for gang purposes, and a shooting takes place involving petitioner as the shooter, and Carranco, for no ostensible reason other than singling out a victim, the Carranco shooting proves a valid point of gang relatedness of the shooting in petitioner's case. Although there may

21

have been some prejudice accruing to Leong from the admission of a killing by Carranco, the Court of Appeal was not AEDPA unreasonable in conducting the balancing which it did. Accordingly, the failure by petitioner's counsel to object on a Cal. Evidence Code section 352 basis was not Strickland prejudicial.

### Claim Three: Gang Expert's Testimony was Improper

Petitioner argues the hypothetical the prosecution posed to Schumacher was unsupported by the facts, denied him a fair trial, and failure by petitioner's trial counsel to object to both the question and answer was deficient. ECF No. 1 at 31. See Section IV of the People v. Christopher Leong opinion. However, as respondent correctly notes, this claim is procedurally barred. The California Court of Appeal articulated that petitioner "forfeited his claim by failing to object to the prosecutor's hypothetical or the expert's response thereto below. (See People v. Gutierrez (2009) 45 Cal.4th 789, 818-819). In any event, his claim fails on the merits." People v. Christopher Leong, *34-35.

> "A federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " Kindler, 558 558 U.S., at ——, 130 S.Ct, at 615 (quoting Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. See Sykes, 433 U.S., at 81–82, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594.
>
> * * *
>
> To qualify as an "adequate" procedural ground, a state rule must be "firmly established and regularly followed." Kindler, 558 558 U.S., at ——, 130 S.Ct, at 618 (internal quotation marks omitted).FN4 [omitted] "[A] discretionary state procedural rule," we held in Kindler, "can serve as an adequate ground to bar federal habeas review." Ibid. A "rule can be firmly established' and regularly followed,' " Kindler observed, "even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Ibid.
>
> California's time rule, although discretionary, meets the "firmly established" criterion, as Kindler comprehended that requirement. The California Supreme Court, as earlier noted, framed the timeliness requirement for habeas petitioners in a trilogy of cases. See supra, at 3 [citing Clark, Robbins, and In re Gallego, 18 Cal. 4 th 825, 18 Cal.4th 825, 77 Cal.Rptr.2d 132, 959 P.2d 290 (1998). Those decisions instruct habeas petitioners to "alleg[e] with

specificity" the absence of substantial delay, good cause for delay, or eligibility for one of four exceptions to the time bar. Gallego, 18 Cal.4th, at 838, 77 Cal.Rptr.2d 132, 959 P.2d, at 299; see Robbins, 18 Cal.4th, at 780, 77 Cal.Rptr.2d 153, 959 P.2d, at 317.

Walker v. Martin, 562 U.S. 307, 131 S.Ct. 1120, 1127–1128, (2011) (abrogating Townsend v. Knowles, 562 F.3d 1200 (9th Cir. 2009)).

The Ninth Circuit has recognized and applied California's contemporaneous objection rule, which provides that a criminal defendant must make a timely objection to the admission of evidence or other objectionable item at trial in order to preserve a claim challenging that evidence/statement on appeal, as grounds for denying a federal habeas corpus claim under the doctrine of procedural default where there was a failure to object at trial. See, e.g., Fairbanks v. Alaska, 650 F.3d 1243, 1256 (9th Cir. 2011); Inthavong v. Lamarque, 420 F.3d 1055, 1058 (9th Cir. 2005); Paulino v. Castro, 371 F.3d 1083, 1092–1093 (9th Cir. 2004); Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002) (citing Garrison v. McCarthy, 653 F.2d 374, 377 (9th Cir. 1981)); Vansickel v. White, 166 F.3d 953, 957 (9th Cir. 1999); Bonin v. Calderon, 59 F.3d 815, 842–843 (9th Cir. 1995). See also MacDonald v. Paramo, 2016 WL 1670524 (E.D. Cal. 2016). Under the contemporaneous objection rule, California courts broadly construe the sufficiency of objections that preserve issues for appellate review, focusing on whether the trial court had a reasonable opportunity to rule on the merits of the objection. Melendez, 288 F.3d at 1125.

The claim is procedurally barred. No specific argument for cause and prejudice has been made, and the undersigned will not review one on his own. Moreover, it is clear that this argument, the improper admission of evidence, would not be cognizable in federal habeas corpus. See Claim 1.

Petitioner adds as a tag line for this issue in his headline of Section 3 of his petition that his counsel was ineffective for not objecting. However, this separate issue was not exhausted, and the undersigned will not treat it as such. In any event, for the reasons set forth in the Court of Appeal opinion, Section IV, involving state law admissibility of expert opinions, petitioner could not have been AEDPA prejudiced.

////

1      ***Conclusion***

2         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

3 habeas corpus should be denied.

4         These findings and recommendations are submitted to the United States District Judge

5 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

6 after being served with these findings and recommendations, any party may file written

7 objections with the court and serve a copy on all parties.  Such a document should be captioned

8 "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

9 objections shall be filed and served within fourteen days after service of the objections.  The

10 parties are advised that failure to file objections within the specified time may waive the right to

11 appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

12 Dated: January 2, 2018

                         <u>/s/ Gregory G. Hollows</u>

13                      UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28